## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELLI HARVEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CA, INC., MICHAEL GREGOIRE, JENS ALDER, RAYMOND BROMARK, JEAN HOBBY, ROHIT KAPOOR, JEFFREY KATZ, KAY KOPLOVITZ, CHRISTOPHER LOFGREN, RICHARD SULPIZIO, LAURA UNGER, ARTHUR WEINBACH, COLLIE ACQUISITION CORP., and BROADCOM INC.,<br><br>Defendants, | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><br><br>**JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Kelli Harvey ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.    Plaintiff brings this class action on behalf of the public stockholders of CA, Inc. ("CA" or the "Company") against CA's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Broadcom Inc. through its wholly-owned subsidiary Collie Acquisition Corp. (collectively "Broadcom").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on July 24, 2018. The Proxy recommends that CA shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby CA is acquired by Broadcom. The Proposed Transaction was first disclosed on July 11, 2018, when CA and Broadcom announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Broadcom will acquire all of the outstanding shares of common stock of CA for $44.50 per share (the "Merger Consideration"). The deal is valued at approximately $18.9 billion and is expected to close in the fourth quarter of 2018.

3.     The Proposed Transaction makes little sense. CA is a software company; Broadcom is a hardware company. There are few, if any, synergies expected with the Proposed Transaction. Analysts have noted that this may just make Broadcom harder to manage. And Broadcom is known for "wringing" value out of acquired companies by drastically cutting costs and selling off business units. If the Board believed that stockholder value could be maximized by cutting costs or selling off segments, it could have chosen to do so. Instead, stockholders are being shut out of a business that has existed for over 40 years.

4.     Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by CA management, as well as the financial analyses conducted by Qatalyst Partners LP ("Qatalyst Partners"), CA's financial advisor.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin

Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to CA's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to CA's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

## PARTIES

6. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of CA.

7. Defendant CA is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 520 Madison Avenue, New York, New York 10022. CA common stock trades on NASDAQ under the ticker symbol "CA."

8. Defendant Michael Gregoire has been CEO of the Company and a director of the Company since 2013.

9. Defendant Jens Alder has been a director of the Company since 2011.

10. Defendant Raymond Bromark has been a director of the Company since 2007.

11. Defendant Jean Hobby has been a director of the Company since February 2018.

12. Defendant Rohit Kapoor has been a director of the Company since 2011.

13. Defendant Jeffrey Katz has been a director of the Company since 2015.

14. Defendant Kay Koplovitz has been a director of the Company since 2008.

15. Defendant Christopher Lofgren has been a director of the Company since 2005.

16. Defendant Richard Sulpizio has been a director of the Company since 2009.

17. Defendant Laura Unger has been a director of the Company since 2004. Defendant

Unger is retiring from the Board at the 2018 annual meeting.

18.     Defendant Arthur Weinbach has been a director of the Company since 2008. Defendant Weinbach is retiring from the Board at the 2018 annual meeting.

19.     Defendants Gregoire, Alder, Bromark, Hobby, Kapoor, Katz, Koplovitz, Lofgren, Sulpizio, Unger and Weinbach are collectively referred to herein as the "Board."

20.     Defendant Broadcom Inc. is a Delaware corporation with its principal executive offices at 1320 Ridder Park Drive, San Jose, California 95131.

21.     Defendant Collie Acquisition Corp. is a Delaware corporation and is a wholly owned subsidiary of Broadcom.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

23.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) CA maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv)

Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on her own behalf and as a class action on behalf of all owners of CA common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

26.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of July 6, 2018, CA had approximately 418.1 million shares issued and outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

> (i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;
>
> (ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;
>
> (iii)   Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(v)    whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction is Unfair to Stockholders

27.    CA was founded in 1976 as Computer Associates International, Inc. and is an enterprise and mainframe software provider. CA operates three business segments: Enterprise Solutions (software for enterprise-wide application development and infrastructure management);

6

Mainframe Solutions (software for mission critical business applications); and Services (consulting, application management services, and support services). Those three operating segments are focused on three specific portfolios. The Agile portfolio includes software development and project and portfolio management. The DevOps portfolio focuses on software that assists the development and management of applications. The Security portfolio focuses on securing data and information.

28.     The Company's overall business strategy focuses on maintaining the mainframe software segment while expanding in cloud and mobile based software solutions. In fiscal year 2018, CA brought in $4.2 billion in revenue; the mainframe software segment alone brought in more than half of that revenue. And the mainframe software segment had a profit margin of 64% in fiscal year 2018, making it highly profitable for CA.

29.     Broadcom designs and develops semiconductor devices used in telecommunication equipment and data center servers and storage systems. Broadcom's business is operated through four segments: wired infrastructure, wireless communications, enterprise storage, and industrial and other.

30.     Broadcom does not develop software. CA does not develop hardware. Yet on July 11, 2018, CA announced that it had entered into the Proposed Transaction with Broadcom.

31.     The reaction to the Proposed Transaction was swift and negative. "It's the most bizarre, defocused, non-strategic acquisition of the last decade," according to the chief executive of Los Angeles-based private-equity firm Patriarch Organization.[1] An analyst for Raymond James stated: "To say the deal came out of left field is an understatement . . . We see no obvious business

---

[1] Sonam Rai and Vibhuti Sharma, "Broadcom loses $19 billion in market value after bid to buy CA," Reuters (July 12, 2018), *available at*: https://finance.yahoo.com/news/hock-broadcom-shares-sink-shock-125413150.html (last visited Aug. 3, 2018).

synergies between the businesses, aside from both being what Broadcom is calling 'mission-critical' technology businesses."[2] Bloomberg analyst Anand Srinivasan called CA's business "highly tangential" to Broadcom's core businesses, and stated that integrating CA "would likely be harder and customer bases have little overlap."[3] Toshiya Hari, an analyst at Goldman Sachs, noted that CA's business is "outside of Broadcom's core competency."[4] Evercore analysts stated: "We think investors will likely be disappointed at this deal, which seems more financial engineering/PE driven than due to any strategic rationale."[5] Other analysts noted that the differences between CA and Broadcom would make the combined company more unwieldly and harder to manage.[6]

32.     The disconnect between Broadcom and CA has damaged Broadcom's reputation. Nomura analyst Romit Shah stated that the Proposed Transaction "hurts [Broadcom] management's credibility."[7] Toshiya Hari, an analyst at Goldman Sachs, stated that "management will need to provide greater clarity on its forward strategy and that it will take time for management to gain investors' confidence in their ability to achieve their goals."[8]

33.     The Proposed Transaction generally is expected to be financially beneficial for Broadcom. Broadcom's management expects the Proposed Transaction to be immediately

---

[2] Ted Greenwald and Miriam Gottfried, "Broadcom Shares Sink as Latest Deal Puzzles Wall Street," Wall Street Journal (July 12, 2018), *available at:* https://www.wsj.com/articles/broadcom-shares-sink-as-latest-deal-puzzles-wall-street-1531431103 (last visited Aug. 3, 2018).

[3] Tipranks, "Broadcom's Decision to Acquire CA Tech Upsets the Market," Investopedia (July 26, 2018), *available at:* https://www.investopedia.com/investing/broadcoms-decision-acquire-ca-tech-upsets-market/ (last visited Aug. 3, 2018).

[4] Wayne Duggan, "Broadcom Gets Another Downgrade From Goldman Sachs," Benzinga (July 18, 2018), *available at:* https://finance.yahoo.com/news/broadcom-gets-another-downgrade-goldman-172136255.html (last visited Aug. 3, 2018).

[5] Tom Taulli, "Don't Buy Broadcom Stock Until This Weird CA Acquisition Shakes Out," InvestorPlace (July 17, 2018), *available at:* https://finance.yahoo.com/news/don-t-buy-broadcom-stock-145625161.html (last visited Aug. 3, 2018).

[6] *Id.*

[7] Tipranks, *supra* note 3.

[8] Duggan, *supra* note 4.

accretive to earnings and increase long-term EBITDA margins up to 55%. Crucially, Broadcom expects that the Proposed Transaction can help "insulate Broadcom from the cyclical nature of the semiconductor market."[9] Goldman Sachs analyst Toshiya Hari expects the Proposed Transaction to add up to 9% to Broadcom's earnings.[10] CFRA Research analyst Angelo Zino stated that the "recurring revenue from CA's subscription-software model will boost incoming cash flows" for Broadcom.[11]

34.     More worrisome is that Broadcom has a reputation for selling units and segments of businesses it acquires. The CEO of Broadcom has been described as "keep[ing] the parts [of acquired companies] he desires, wringing efficiencies out of the them, and shed[ding] the rest."[12] The Broadcom CEO has been able to "wring[] out value from his deals" by cutting costs and selling off business units.[13] Already analysts expect the same thing to happen to CA. John DiFucci, analyst with Jefferies LLC, stated: "While it is difficult to see an exit strategy, the mainframe business can be milked for a very long time — providing a significant dividend to Broadcom — and the best of what is left might be able to be repackaged and sold as a rejuvenated new company via IPO or to another buyer."[14] Other analysts from Jefferies noted that Broadcom has "consistently demonstrated its ability to drive costs down and margins of its acquisitions up, often measured in 1,000s of basis points."[15]

35.     If cutting costs or selling off units would benefit CA, the Board could have opted

---

[9] Greenwald, *supra* note 2.

[10] Duggan, *supra* note 4.

[11] Martin Cassidy, "Analysts Give Broadcom/CA Merger Mixed Reviews," The Street: Real Money (July 12, 2018), *available at:* https://realmoney.thestreet.com/articles/07/12/2018/analysts-give-broadcomca-merger-mixed-reviews (last visited Aug. 3, 2018).

[12] Greenwald, *supra* note 2.

[13] Taulli, *supra* note 5.

[14] Therese Poletti, "Broadcom deal to buy CA makes little sense on the surface," MarketWatch (July 13, 2018), *available at:* https://www.marketwatch.com/story/broadcom-deal-to-buy-ca-makes-little-sense-on-the-surface-2018-07-11 (last visited Aug. 3, 2018).

[15] Rai, *supra* note 1.

to do those things. Instead, the Board decided to sell the Company in a transaction that cuts off the stockholders and denies them the opportunity to see the benefits of their investment.

**B. CA's Officers Stand to Receive Benefits Unavailable to the Class**

36.    The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

37.    Options, restricted stock units, performance shares or stock units, restricted shares and deferred stock units that have been awarded to and are held by CA's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through CA's change in control severance policy, will create a windfall for CA's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of CA in total stand to receive up to $92.7 million, if within two years of the Proposed Transaction they are let go without "cause" or voluntarily leave for "good reason," or are terminated within six months before the Proposed Transaction closes:

| Named Executive Officers | Cash ($) | Equity ($) | Pension / NQDC ($) | Perquisites / Benefits ($) | Total ($) |
|---|---|---|---|---|---|
| Michael Gregoire | 8,687,568 | 40,285,751 | — | 47,937 | 49,021,256 |
| Kieran McGrath | 3,997,282 | 7,217,582 | — | 47,937 | 11,262,801 |
| Ayman Sayed | 4,059,740 | 11,792,461 | 7,372 | 47,937 | 15,907,510 |
| Lauren Flaherty | 2,666,096 | 10,083,024 | — | 47,974 | 12,797,094 |
| Adam Elster | — | 3,717,619 | — | — | 3,717,619 |

38.    The members of the Board and the executive officers stand to gain handsomely even if they stay on after the Proposed Transaction closes. In total, as demonstrated in the following chart, the executive officers and Board members will obtain more than $191 million:

| | Value of Shares Held ($) | Value of Vested CA Options ($) | Value of Unvested CA Options ($) | Value of CA RSU Awards and CA PSU Awards ($) | Value of CA RS Awards ($) | Value of CA DSU Awards ($) | Total Value ($) |
|---|---|---|---|---|---|---|---|
| **Executive Officers** | | | | | | | |
| Michael Gregoire | 12,258,326 | 33,395,845 | 9,189,329 | 25,404,249 | 5,692,173 | — | 85,939,922 |
| Lauren Flaherty | 3,147,040 | 7,457,766 | 2,280,215 | 6,398,611 | 1,404,198 | — | 20,687,830 |
| Ava Hahn | — | — | 648,111 | 2,851,071 | 504,497 | — | 4,003,679 |
| Jacob Lamm | 2,086,650 | 724,966 | 914,861 | 2,521,326 | 565,106 | — | 6,812,909 |
| Kieran McGrath | 1,484,031 | 446,926 | 1,645,247 | 4,317,524 | 1,254,811 | — | 9,148,539 |
| Paul Pronsati | 1,893,653 | 1,284,725 | 1,001,488 | 2,765,987 | 618,239 | — | 7,564,092 |
| Ayman Sayed | 1,851,334 | 140,659 | 2,585,855 | 7,647,815 | 1,558,791 | — | 13,784,454 |
| Michael Bisignano | 2,206,310 | — | — | 1,347,549 | — | — | 3,553,859 |
| Adam Elster | 142,623 | 719,617 | 2,660,528 | 3,717,619 | 1,638,446 | — | 8,878,833 |
| **Directors** | | | | | | | |
| Jens Alder | — | — | — | — | — | 2,123,540 | 2,123,540 |
| Raymond Bromark | 44,500 | — | — | — | — | 3,336,076 | 3,380,576 |
| Jean Hobby | — | — | — | — | — | 119,438 | 119,438 |
| Rohit Kapoor | 890,000 | — | — | — | — | 2,957,470 | 3,847,470 |
| Jeffrey Katz | — | — | — | — | — | 1,039,609 | 1,039,609 |
| Kay Koplovitz | — | — | — | — | — | 2,846,309 | 2,846,309 |
| Christopher Lofgren | — | — | — | — | — | 4,129,422 | 4,129,422 |
| Richard Sulpizio | — | — | — | — | — | 2,672,136 | 2,672,136 |
| Laura Unger | — | — | — | — | — | 3,553,370 | 3,553,370 |
| Arthur Weinbach | 1,112,500 | — | — | — | — | 6,031,263 | 7,143,763 |

## C. The Preclusive Deal Protection Devices

39.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

40.     By way of example, section 6.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 6.3(a) further demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal.

41.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be Broadcom. For example, pursuant to section 6.3(c)

of the Merger Agreement, the Company must notify Broadcom of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 6.3(e) requires that the Board grant Broadcom four (4) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. Broadcom can match the unsolicited offer because, pursuant to section 6.3(c) of the Merger Agreement, the Company must provide Broadcom with the identity of the party making the proposal, the material terms of the superior proposal, and unredacted copies of written requests, offers or proposals, eliminating any leverage that the Company has in receiving the unsolicited offer.

42.     In other words, the Merger Agreement gives Broadcom access to any rival bidder's information and allows Broadcom a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for CA, because the Merger Agreement unfairly assures that any "auction" will favor Broadcom and allow Broadcom to piggy-back upon the due diligence of the foreclosed second bidder.

43.     In addition, pursuant to section 9.2(b)(iv) of the Merger Agreement, CA must pay Broadcom a termination fee of $566 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide

an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Broadcom's inadequate offer price.

### D.  The Materially Incomplete and Misleading Proxy

45.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to CA stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

46.     On July 24, 2018, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, CA shareholders cannot make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

### *Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

47.     The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of Qatalyst Partners' fairness opinion, Qatalyst Partners reviewed "certain forward-looking information relating to CA prepared by the management of CA, including financial projections and operating data of CA." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that CA's management provided to the Board and Qatalyst Partners.

48.     Notably, Defendants failed to disclose the projections for fiscal years 2019 to 2024 for: (a) depreciation and amortization; (b) GAAP operating income; (c) cash taxes; (d) capital expenditures; (e) changes in net working capital; (f) stock-based compensation expense; and (g)

cash tax charges related to the ASC 606 transition and related to the repatriation of cash associated with the Tax Cuts and Jobs Act of 2017. This omitted information is necessary for CA stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

49.     The Proxy also does not disclose the author of the projected unlevered free cash flows for the second through fourth quarters of fiscal year 2019 and fiscal years 2020 to 2023. The section of the Proxy containing financial projections lists revenue, EBITDA, non-GAAP operating income and non-GAAP diluted earnings per share for fiscal years 2019 to 2024 as being "prepared by management and provided to the CA board and Qatalyst Partners." The projections for unlevered free cash flow is listed separately. Qatalyst Partners states in its description of its *Illustrative Discounted Cash Flow Analysis* that it utilized "the implied net present value of the estimated future unlevered free cash flows of CA, based on CA projections for the second through fourth quarters of fiscal year 2019 and for fiscal year 2020 through fiscal year 2023." It is not clear if the projected unlevered free cash flows for the second through fourth quarters of fiscal year 2019 and fiscal years 2020 to 2023 were prepared by CA management or by Qatalyst Partners.

### *Materially Incomplete and Misleading Disclosures Concerning Qatalyst Partners' Financial Analyses*

50.     First, with respect to the *Illustrative Discounted Cash Flow Analysis,* the Proxy fails to disclose the concluded net present value amount of CA's estimated cash tax charges related to ASC 606 and the repatriation of cash. The Proxy further fails to disclose the individual inputs and assumptions utilized by Qatalyst Partners to derive the discount rate range of 8.0% to 10.0%, as well as the implied perpetuity growth rate range resulting from the analysis. In addition, the Proxy fails to disclose the basis for deriving the terminal NOPAT multiple range of 10.0x to 15.0x. Finally, the Proxy fails to disclose how, if at all, Qatalyst Partners incorporated CA's NOLs in the analysis.

51.     Second, with respect to the *Selected Companies Analysis,* the Proxy fails to disclose whether Qatalyst Partners performed any type of benchmarking analysis for CA in relation to the selected public companies.

52.     Finally, with respect to the *Selected Precedent Transactions Analysis*, the Proxy fails to disclose whether Qatalyst Partners performed any type of benchmarking analysis for CA in relation to the target companies.

### Materially Incomplete and Misleading Disclosures Concerning the Flawed Process

53.     The Proxy also fails to disclose material information concerning the sales process. For example, the Proxy fails to state whether CA entered into confidentiality agreements with Sponsor A, Sponsor B or any other party that indicated interest in a transaction with CA in 2017. The disclosure of the terms of any standstill provisions is crucial to CA stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company. In addition, section 6.3(a) of the Merger Agreement prohibits the Board from waiving any previously executed standstill agreement (the "Anti-Waiver Provision"). Whether the Board agreed to that provision knowing that confidentiality agreements contained such a standstill agreement, must be disclosed to CA stockholders before they decide on voting for or against the Proposed Transaction.

54.     The Proxy fails to disclose the extent of the relationship between Qatalyst Partners and CA or Broadcom. For example, the Proxy states that "no material relationship" existed between Qatalyst Partners and Broadcom but does not define materiality or whether any other relationship existed. In addition, the Proxy does not disclose the scope of financial advisory services provided by Qatalyst Partners to CA, including services provided by any of Qatalyst Partners' affiliates. Finally, the Proxy does not disclose when CA agreed to pay Qatalyst Partners

$80 million for its work with CA. Qatalyst Partners received $500,000 after executing an engagement letter with CA, another $300,000 in August 2017, and then $5 million after delivering its fairness opinion to the Company. Almost $74 million is contingent on the closing of the Proposed Transaction. However, the Proxy does not disclose whether Qatalyst Partners agreed to an $80 million fee when it executed its engagement letter with CA, or if that amount was discussed afterwards, when those discussions took place.

55.     Qatalyst Partners provided the Board with several financial analyses throughout the process, yet the Proxy does not disclose these analyses. These include the comparisons provided at the June 13, 2018 Board meeting, the June 18, 2018 Board meeting, the June 20, 2018 Board meeting, the July 8, 2018 Board meeting, and the July 11, 2018 Board meeting. Qatalyst Partners created a preliminary valuation of CA, as discussed at the June 20, 2018 Board meeting, yet that valuation was not disclosed.

56.     Finally, in its meeting on June 13, 2018, the Board discussed that "CA had not materially exceeded its forecasted financial plan." However, that forecasted financial plan was not disclosed in the Proxy, and the Proxy fails to disclose whether the Company had updated its forecasted financial plan after 2017.

57.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, CA stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

58.     In addition, the Individual Defendants knew or recklessly disregarded that the

Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

59. Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

60. Further, the Proxy indicates that on July 11, 2018, Qatalyst Partners reviewed with the Board its financial analysis of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to CA shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Qatalyst Partners' financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

61. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

62. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63. Defendants have filed the Proxy with the SEC with the intention of soliciting CA shareholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

64. In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of CA, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

65. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

66. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of CA shares and the financial analyses performed by Qatalyst Partners in support of its fairness opinion; and (iii) the sales process.

67. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Qatalyst Partners reviewed and discussed its financial analyses with the Board during various meetings including on July 11,

2018, and further states that the Board relied upon Qatalyst Partners' financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

68.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of CA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of CA and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

71.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

73.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

74.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

75.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and her counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to CA shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 3, 2018

**ROWLEY LAW PLLC**

*S/ Shane T. Rowley*

Shane T. Rowley
srowley@rowleylawpllc.com
Danielle Rowland Lindahl
drl@rowleylawpllc.com
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514